Final case in our call this morning is agenda number five case number 1 0 8 6 5 6 Amy Clark at all versus the Children's Memorial Hospital. Council may proceed when ready. May it please the court, counsel, I'm Gary Feinerman from Sidley Austin here on behalf of the defendants appellants Children's Memorial Hospital and Dr. Barbara Burt. As in our briefs, I'll address three issues. The first is whether wrongful birth plaintiffs can recover what we've called a misdemeanor. damages. Second, whether wrongful birth plaintiffs can seek damages for negligent infliction of emotional distress. And third, and the alternative, whether the plaintiff's claims against Children's Memorial and Dr. Burton are barred by the statute of limitations. With respect to the post-majority expense issue, the issue is determined, we submit, by two general principles. The first, which is undisputed, is that for a parent to recover a child's medical expenses in a tort case, the parent must be legally liable for those charges. And the liability cannot arise after the fact, based upon the parent's voluntary assumption of responsibility for those expenses. The second principle is that the parent must be legally liable for the child's medical expenses. And the third principle is that Illinois law, common law and statute, does not obligate parents to provide for a disabled child's medical or other expenses past the age of majority. And putting those two principles together, the conclusion is that a parent bringing a wrongful birth claim, just like a parent bringing any other tort claim under Illinois law, cannot recover the cost for caring for an adult disabled child. The second principle is the only one that's really at issue here. And this court and the general, the issue of whether parents have a post-majority duty of care. And this court and the General Assembly have spoken very clearly on this issue. With respect to the common law, this court held back in that the duty of support that a parent has for an adult child, it may be a moral duty, it may be a natural duty, but it is not a legal duty and is not imposed under the common law. The General Assembly stepped in in 1874 with the Pauper's Act and imposed a statutory duty on parents in those situations. But as we set forth in our brief, over the decades, the General Assembly has not imposed a statutory duty on parents in those situations. The Pauper's Act reduced that duty in 19, narrowed the duty in 1967, and in 1969 under the Public Aid Code, completely eliminated the duty so that now under Section 10.2 of the Public Act Code, parents owe no duty to support or provide medical expenses or cover other expenses of an adult disabled child. Adult meaning past the age of 18, or if the child is 16 years old. The same holds under the Family Expense Act, where the courts have consistently held, and the appellate court in this case, recognized that a parent's legal obligation to support a child ends at adulthood. So is there any kind of public policy that perhaps should guide us when we realize that if we follow your position, is the public policy that should be in place? And those who have been perhaps responsible for the loss and the injury is off scot-free at the reach of the majority. At the reach of the majority, yes. I think the public policy in this situation has already been determined. There's the common law, and then there's statute. And the court held over a century ago that the common law does not impose this obligation. And the General Assembly has held that the law does not impose this obligation. So it's, as a matter of public policy, especially Is public policy something that evolves, and can this court speak to public policy? Yes, the court can speak to public policy. But in a situation like this, where the law does not impose this obligation, the law is consistent across the board, common law and statutory. And in a cause of action that really turns on very, as the court recognized in Semenyak, very difficult legal and moral and philosophical issues, here the injury is, there's no doubting that the plaintiffs here are very sympathetic. But there's also no doubting that, as in any wrongful birth case, the injury here is the birth of a child. Mr. Fragerman, should a distinction be made between a case like Semenyak, which I believe involved hemophilia, which allowed that particular child to become emancipated, and a case such as this, where the damages will far exceed the date of emancipation of the minor? No, no, because, again, it's the settled principle of Illinois tort law, the principle that governs all other cases, is that a parent cannot recover post-majority expenses unless there is a legal obligation, a preexisting legal obligation on the parent to do so. And in Illinois, there is no such obligation. And what the plaintiffs are asking for here is an exception to that rule for the wrongful birth tort. The emotional distress, is that? I'm sorry? The emotional distress count? Yes. Is that available past majority? That's not available at all. Yeah, emotional distress. But in terms of the post-majority medical expenses and other expenses... Not available because of the circle? Because of the zone of danger rule, yes. With respect to the medical expenses... Did the Appellate Court rule on that, the zone of danger? Yes, the Appellate Court ruled that the plaintiffs had satisfied the zone of danger standard. And I'm happy to address that issue now and then return to the issue of medical expenses. Under RICI and under Semenyak, which applied the RICI zone of danger test, in the context of a wrongful birth case, there are a number of requirements. That must be satisfied for there to be a claim for emotional distress. One of them is that the plaintiff must be, quote, in such proximity to the accident in which the direct victim was physically injured, that there was a high risk to him of physical impact, end quote. And the second requirement is that the plaintiff have suffered physical injury as a result of, that derives from, that court rejected the emotional distress claim brought by the plaintiff in that case, and we submit that nothing has happened over the past 23 years to warrant a different result in this case. The plaintiffs here argue that they're in the zone of danger because Timothy has impaired control over his body, and therefore they are subject to physical harm as a result of his biting and head butting and hitting. But under RICI and under Semenyak, not just any physical impact satisfies the zone of danger rule. Certainly there is physical impact here, but it's years after, there isn't a spatial and temporal proximity to the accident that resulted in Timothy's birth to fall within the zone of danger rule. And Corgan explained this four years after Semenyak. Corgan held that a person is within an accident zone of danger when he or she is sufficiently close to that accident that he is subjected to a high risk of physical impact emanating from the accident itself. And the accident is what ended up causing the harm. And here what ended up causing the harm was the alleged misdiagnosis of the genetic Angelman syndrome. And at that particular point in time, the parents had no fear of danger, and at that particular point in time, the parents were not in danger of any physical impact at the time of the diagnosis. The physical impact they are alleging had no effect on the diagnosis, but it happened years later. And that just, that's not the kind of physical impact that RICI speaks of and that Semenyak speaks of. And with respect to the second requirement, that some, that the physical distress, that the emotional distress lead to some physical impact and injury, the plaintiffs argue that it's not the case. Their complaint can be construed as alleging physical injury that arises from their emotional distress, and they point to a part of the complaint that's reproduced at page 47 of our appendix, but it's simply not there. It's not difficult to write a complaint that says we've suffered emotional distress, and as a result of that emotional distress, we've seen a physician. And that's just not in there, and the complaint can't be stretched to make that allegation. Recognizing that, I think perhaps recognizing that the zone of injury doctrine doesn't quite allow them to state an emotional distress claim, the plaintiffs next argue that, well, we're not bystanders at all. We're direct victims, and of course, if they're direct victims, the RICI zone of danger standard doesn't apply. But that argument is foreclosed by Corgan, which again was decided four years after Semenyak, and in Corgan the court addressed Semenyak. In fact, the plaintiff in Corgan argued that Semenyak was a direct victim case, and the court held that Semenyak likened the parents to bystanders who were witnessing the effects of hemophilia on their child, and referred the child to a bystander case as the parents suffered emotional distress because of their child's disease. So Semenyak certainly indicated in Corgan confirmed that wrongful birth plaintiffs are bystanders and not direct victims, and therefore, the zone of danger standard applies. When you get back to your first point, I've got a question for you. I'm back, yes. Okay. Would the child be able to file a cause of action for these damages by next parent bringing those? No. No. I think that would be a wrongful life cause of action, and that was foreclosed in Semenyak. And picking up where I left off... I mean, if the child was 17 and suffered a massive injury that extended into their adulthood, they would be able to sustain a cause of action by the parent and next friend. But the difference you're saying is that this would be premised on the wrongful birth. Right. Timothy's cause of action in this case would be a wrongful life cause of action. The cause of action saying that I shouldn't have been born at all. And in Semenyak, the court held that Illinois just wouldn't, although a couple states recognized it. Illinois would join the majority of states and not recognize that kind of a cause of action. The other question I have is, how can you really say that these plaintiffs would be fully compensated if they're not able to address these extraordinary costs that are associated with the ongoing life of this child? They wouldn't be. Assuming that they want to pick up the post-majority costs and don't want to rely on Medicaid or other government programs, which is a voluntary choice on their part, in that limited sense, they're not being fully compensated. But Semenyak spoke directly to that issue. Semenyak said, acknowledged, forthrightly, expressly, that as a general rule, the central purpose of tort law is to allow the plaintiff to recover all foreseeable damages that arise from a negligent act. Put it out there and acknowledged it. Then it went on to say in the same paragraph, that rule does not apply in wrongful birth cases because it's such a unique tort and because there are these philosophical and legal and moral issues, and because, again, at root, the injury is the birth of a child. And because of the unique nature of the wrongful birth tort, that general principle of tort law that you mentioned doesn't apply, I think that the term was, with full vigor in wrongful birth cases. And what the plaintiffs here are doing is seeking to turn Semenyak on its head. Semenyak said that, and Semenyak said that, in wrongful birth cases yield fewer damages, fewer types of damages as in the ordinary tort. What the plaintiffs are asking for here are more damages than in an ordinary tort. Because in an ordinary tort case, brought by a parent to recover for the medical and other expenses of a child, there must be legal liability on the parents. There is no legal liability on the parents post-majority. And there is none in Illinois. And what the plaintiffs are saying is that, okay, for all these other torts, parents cannot recover post-majority expenses. But for the wrongful birth tort, there ought to be an exception to that, and we ought to be able to recover post-majority expenses. And as I said, that turns Semenyak on its head. It gives wrongful birth plaintiffs a preferred position on damages when Semenyak said that the normal damages rule applied with less vigor in wrongful birth cases. In order to conjure a post-majority obligation, the plaintiffs, they don't address the common law case that we decided, the Peoria v. Hill case, don't address the Family Expense Act, don't address the evolution of the Paupers Act to the Public Act Code. And I think that's significant because I think it indicates that there really is no response there. What the plaintiffs do do is focus on Section 513 of the Marriage Act, which does allow a court to require one or both divorced parents to provide educational support to any adult child and to provide support to a disabled adult child. And what the appellate court held, and the plaintiffs understandably adopt this, adopt that holding here, is that what this Section 513 shows is that it shows that the General Assembly established a general principle that a court can decide on a case-by-case basis whether parents have a legal obligation post-majority. And again, that's very similar to the principle I spoke to. Unless there is a post-majority legal obligation, there can't, a parent can't recover post-majority expenses from a third-party tort fees in a tort case. Is the appellate court correct, Mr. Freidman, that Semenyak never directly addressed post-majority damage? They weren't even  able to not rule on it. What the Supreme Court did is mention that, yes, there are some other states that allow post-majority damages in wrongful birth cases, but it's interesting, in that very brief discussion, what the court noted is that in those states, the courts relied upon a common law obligation imposed upon parents to care for children, disabled adult children, past the age majority. And that's those states. And in those states, as we laid out in our brief, there is either a statutory or a common law or both kinds of obligations of post-majority support on parents. But in Illinois, it's different. But you would assert that was dicta, though? So they didn't even seek it? Right. Yeah, the whole discussion was dicta in the sense that it was not necessary to the decision in the case. If we disagree, Semenyak doesn't have to be overruled, right? Oh, no, no. Semenyak left the issue open. Semenyak, what I'm trying to squeeze as much out of Semenyak as I can by saying that, Semenyak said, yes, there are some states where post-majority recovery is allowed. And in those states, there is a common law obligation on parents to provide post-majority support. And I'm kind of using that as a negative example. Sure. Yeah, I understand. So the Marriage Act does not provide a general principle that these kinds of issues are decided on a case-by-case basis. The General Assembly drew very clear lines. In the Public Aid Code, in the Mental Health Code, in the Family Expense Act, there is no general obligation to provide, for a parent to provide post-majority support. There is one narrow exception provided by the Marriage Act. It doesn't apply outside the context of divorce. And, in fact, in Kujawinski, the court held that Section 513 does not mandate that divorced parents support children of majority age. It just mandates it in particular circumstances. I see your time is running, and I'd like just the answer to this question on the statute of limitations. As I understand your argument, there was a point in time in which the parents thought that Tim, it was Tim, right, may have Angelman's, right? Right. My question specifically as to the statute of limitation is, since Angelman can be both genetic or random, right, how would the parents, they might feel that their child may have had Angelman, but how would they either know or should have known that it was a result of the failure to accurately report the test until they did get the test definitively saying that it was genetic? My time is up. May I? You can answer. Thank you. They certainly didn't know with certainty, but that's not the test under the should have known standard. Certainty is not the trigger of when the statute of limitations arises. What Witherell and cases like Witherell and Nolan hold is that the trigger happens when the plaintiff is possessed of sufficient information concerning its injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. So you don't need the actual test results in your hands. You just need to have some knowledge. But everything they were told to this point is that it could be genetic and it could be random. I mean, they knew when they had their next child, there was the possibility that their child would have Angelman. They also were alerted that if it was genetic, there was a 50 percent greater chance. So, yeah, they knew that at a point probably going further back than you allege is the date they knew or should have known. But I'm just thinking because of the nature of the disease, it could be random or genetic. Did they really have knowledge or should have known until they had those test results which said definitively it was genetic? Yes, they were on notice that something could have gone wrong. What the test is, again, it's not certainty. It's not having the test results in your hand. It's is there something going on here that warrants a follow-up, that warrants further examination? And here in August of 02, which was more than two years before Children's was named as a defendant, Ms. Clark said, I believe that Timothy has Angelman syndrome. And given that, given her knowledge of the genetic mechanism, given that she knew what she had been advised, at that point, she was certainly put, the plans were certainly put on a duty of inquiry that was sufficient to trigger the statute of limitations. Thank you. Good morning. Christopher Hurley for Plano. I'm going to pick up on that last issue just because I think it's fresh in everyone's mind. Actually, there's no way they knew that this child had a genetic Angelman's at the time Timothy was in those early formative days. What happened was Mrs. Clark heard about a study that was being done by somebody who was trying to study children who had random Angelman's, who had no known genetic cause, and as a result, she applied for the study, and the doctor said, well, yeah, you can be in the study. Let's see all your genetic tests. And so she went and got her file, handed it to him, and the doctor said, well, where's the UBE3A test? And she said, well, you know, it should be there, and it's not. And so then she went on a quest to try to get it from one of her two board-certified geneticists that had told her she had no genetic cause for Angelman's, and that doctor was not compliant. She finally had to go to Baylor, and it wasn't until September 30th, less than two years before we filed against this defendant, that she was told on the phone by some person who was unnamed, we don't even know who it is, yeah, this test is abnormal. So that was the first time she found out there was a genetic cause, and as your Honor just pointed out, Angelman's can be genetically caused or it can be random. If it's random, then there's no cause of action here of any kind. And so it's not until she knows that she had the genetic form that she knows she has a cause of action. And it wasn't until we, she then contacted a lawyer after she found that out, and we chased it down, got the report, and found out it was, in fact, a genetic cause. So there's no way she could have known this was wrongfully caused until that day. Going back to the first issue that was discussed, the defense has tried to redirect the court on this topic to what the parents are liable for paying for their children, you know, minors or adults. The issue here is what should a tortfeasor be liable for paying as a result of causing an injury? And in this particular case, this is a common law tort that was recognized by this court in Semenyak 23 years ago. And what the court recognized is that the parents are the victims here. The parents are the ones who have been harmed by this negligence. And so then the question becomes who's going to pay for the damages? Well, the damages in Semenyak didn't, or at least they weren't pled to have gone into the years after the child was going to be 18. Here these damages are going to continue for the life expectancy of this child. And that will be, you know, at least well into his 70s. These children are profoundly brain damaged and need 24 hour a day care. To take them to the dentist is, it's not a matter of going in for a 25 minute appointment. It's about a three or four day process. So when this child is 25 years old or when he's 35 years old, those extraordinary damages are going to continue to accrue. Those damages have been caused by a tortfeasor and a tortfeasor should be held responsible for those. To suggest that, and there's practical problems that will be associated with this for this family going forward. Many health care providers or many of the best health care providers will not take public aid or Medicaid. And so, you know, you, for example, Mrs. Clark takes Timothy to St. Louis for his eye care. There are no guarantees that the state or the federal government will have the money to pay these damages in the future. And I actually would compare this more or less to a collateral source type argument being made by the defense. Where they really want the benefit of the fact that, well, the family can go get this money to pay for these expenses from the state or from the federal government in some way, so we shouldn't have to do it. They're trying to get the benefit of the hope that some third party will pay these costs in the future. And I don't think that is or should be the public policy of this state. I think the public policy of this state, I think recognized in Semenyak, is that when someone is negligent and that negligence results in extraordinary damages that are going to last forever. On the other side of that public policy argument, we have law in Illinois that the parents are no longer responsible at the majority. So if they should prevail, there's nothing that would prevent them, I believe that they would, from walking away from the situation and still leaving it at the public's expense. I think that's something that this court can address. I think this court has the power to address it if it chooses. And I think there's two ways that you can go. One is we can prove and will prove at trial that this family is going to take care of this child for his entire life and there's no question that's going to happen. If the court's not comfortable with that, I think the court has the equitable power, as the court did in the Florida case, which is called PUSH, to say the money will be held in trust for medical expenses. If there's some concern by the court that the parents won't use it as it should be used, that can be done and I think should be done. You know, this is a common law tort, which has some unique aspects, which I think you just pointed out. How does the court know that the parents will spend the money on the child? I think we can prove it. I think a jury can find that we can prove it. But I also think if the court, and I think this court has the power to make the common law, and the common law maybe ought to be that the money's held in trust for the child. There'd be no objection to that on our part. In any event, I think that it's important to recognize that the attempt to sort of tie this type of case to various statutes, which have been enacted for other reasons, really is an attempt to misdirect the court from the real issue, which is that the tort fees should be liable for damages it causes. So what I'm saying is, you know, the Family Expense Act enacted over 100 years ago, to make sure that, you know, families don't fraudulently avoid their creditors, really was not written with this type of a case in mind. And this case really has to be ruled on on a case-by-case basis, as I think the court hinted at in Semenyak, by not going to the majority issue at that point. They're just waiting for it to come up. So are you saying that you don't agree that the law currently is that parents have no responsibility for their child's medical expenses beyond majority? Well, I don't... You're not telling us it's a case-by-case analysis, are you? Or maybe you are. Well, I think that realistically, in this case, the parents cannot, I agree with the court, the parents cannot be sued for the child's medical expenses paid. They have to pass the age of majority. But as a practical matter, when this boy is 20 years old, he's going to need some medical care. The parents are going to have to take him in to a provider, and the provider is going to say, who's paying for this? If the state's not there to pay, or if the state chooses, you know, for whatever reason, if the state doesn't pay, then the parents are going to have to pay, because obviously the child doesn't have the ability to enter into a contract. So these damages are going to continue to accrue, regardless of whether the parents can be sued or not for the damages. Is this something that ought to be addressed by the legislature? No, I don't think so. I think this court's the proper place to establish common law damages and common law torts. To expect the legislature to drill down to an issue as fine as this one and get it right, I don't think is too likely. And I don't think it's something this court has to wait for, because we may be waiting a long time for something like that. I think the proper way to handle common law tort damages is for the courts that make the common law to establish what the proper damages are. And so just to suggest that because the parents can't be sued for these medical expenses after the boy is 18 does not change the fact that these expenses are going to be accruing over the years. They're going to continue to happen. And it should not be a windfall that falls upon a tortfeasor to not have to pay these just because of that. I'd like to touch on the... Does this differ from the hemophiliac? It is. The hemophiliac case, or the seminiac case where the child was a hemophiliac, at the age of 18, there was an indication, I think, at least in that decision, that that boy would be able to enter into his own contracts and get his own health insurance and pay his own debts. And so there was no suggestion that the parents were going to be, you know, saddled with this burden for their whole lives. And the point in this case is that we have these parents who will have the burden of rearing this child for their, you know, for his entire life and their entire lives, and so it does differ. You know, the distinction between this case and other cases where parents maybe try to get damages for their emancipated children is that, you know, if there's some auto wreck and your child's involved in an auto wreck, you know, there's a risk that the child can get all the damages for himself in his own cause of action, or his estate can get it. In this case, because of the nature of the wrongful birth, only the parents can get damages. The child isn't entitled to get any damages. So under the law, there's not going to be a double recovery here allowing the parents to get these damages. So I think there's a major distinction between the cases cited where parents aren't entitled to get damages. If the parents aren't able to get damages for adult children, there's a reason for that. The children themselves can get those damages. In this case, the children can't get them, and the damages end up not getting paid by anyone if you don't allow the parents to recover them. And as for the wrongful or the emotional distress issue, I'd like to touch on that briefly. The defense skipped over the Corrigan case, which is a 1991 Supreme Court case, where this court specifically held it where the party is a direct victim of a tort, there's no need to plead a zone of danger. And so in Corrigan, there was a psychological malpractice case where a psychiatrist was having sexual relations with a patient. And in that case, the court reasoned that, you know, the patient is the direct victim, and so does not need to plead a zone of danger. And here in the wrongful birth context, the parents are the direct victims. The parents in this case specifically went out and to some trouble to make sure they didn't have a genetic cause of this Angelman syndrome, because they knew that the burden of dealing with one child was too much for them. And so they went to a great deal of trouble to make sure they didn't have this condition. Then when they get this child, it is literally their worst nightmare. And the emotional distress is a real thing that they experienced. So the negligence went directly from the doctor to the parents, and the parents are so upset that they can't do anything about it. They're suffering for it. So there's no reason under the Corrigan reasoning why they have to plead a zone of danger at all. Did Corrigan not say that the plaintiffs in a wrongful birth case are bystanders? I think that in Corrigan... And not direct victims? I don't remember that exact quote, Your Honor, but I do have a... I do think that what they... What I was relying on was that they note that in Simenac the majority's mere failure to address the direct victim slash bystander distinction does not amount to an expansion of the zone of danger rule to include direct victims. My feeling is that in Corrigan they didn't really overrule Simenac. They just sort of recognized that the Simenac decision didn't go into this topic in depth. I think in reading Simenac that's accurate. The only point I'm making is that I don't think the parents are bystanders here. The parents physically, you know, walked into a doctor's office and asked for this specific advice. Please tell us if this is going to happen again, because if it is we're not going to have another baby. They're given the wrong advice, and then the worst thing that they can imagine happens. And now they suffer for it, not just as soon as they discover it, but for the rest of their lives. And so I think it's a classic common law tort where there's negligence, there's proximate cause, and there's injury. And now there needs to be damages. And Corrigan goes on to say more than one, you know, I think at length that it should be the jury's decision as to what these emotional distress damages are. So that whole issue will revolve around the fact whether this court finds them to be victims. You would agree that if we find them to be bystanders, a zone of danger does apply? And if that's, yeah, I think that's right, Judge. If they are considered to be bystanders, then we need to plead that they were within the zone of danger, which we did, and which I believe they were. I mean, so if you come to that conclusion, you know. Was there any, in the pleadings, did the plaintiffs ever plead that their physical injury resulted from the emotional distress? Well, I think that there's. Or any physical injury resulted from the emotional distress. What we plead is that the children are actually physically dangerous at times, and so that causes physical injury to the parents. But isn't that after the fact of the birth? I think it's an ongoing injury, Your Honor. I agree with you, it is after the fact. But the tort doesn't end the day the baby's born. The tort is going to continue for his whole life. I mean, the damages are going to continue. Can I talk about the zone of danger for the plaintiffs? Well, I think that, you know, I think as Judge Justice Simon pointed out in his dissent in Seminac, and I think as Corgan starts to recognize that zone of danger is a legal fiction that is created to avoid situations where the child is physically dangerous. Where people fraudulently try to piggyback onto accidents. The best way I can think of it is my office overlooks a busy intersection, and there's hundreds of people that could be looking out the window and see an accident, and we can all run down and file lawsuits saying we were upset by it. So the zone of danger rule is designed to sort of limit that kind of a problem. In the context of a wrongful birth case, it's just not even a realistic issue. I mean, there's not a chance that fraud or anything like that could come into play here, because there's this one baby and there's two parents, and they got this medical advice. I think the courts in the Colorado decision, Leninger, and the Florida decision, Cush, are instructive on this in that, you know, they just recognize that wrongful birth cases don't fit into the cookie-cutter mold. Of the need for zone of danger evidence. I mean, having said that, we still plot it in our complaint, and we still take the position that we're within the zone of danger. But, you know, I'm being perfectly frank with the court, I think that these types of cases just aren't good cookie-cutter cases for that type of, you know, for the zone of danger rule. So the only other, I guess the only other point I'd make is if the court's interested in this statute of limitations issue, you know, it was never appealed below, it was not on a final judgment, and ultimately it's a question of fact for the jury, and that is because there's just no question that this family did not know there's a wrongful cause to this until that day when they were advised that this was a genetic cause as opposed to the random type cause. Thank you. Thank you, Counselor. Let me first address the emotional distress issue. Corgan held in no uncertain terms that wrongful birth plaintiffs are subject to the bystander rule and are not direct victims. And that's on, I won't quote from the opinion, but that's on pages 305 and 306. 305 to 306 of the Corgan case, it very clearly says that Semenyak considered the parents to be bystanders and not direct victims. And the plaintiffs then ask, given that the zone of danger rule can't be reconciled with the wrongful birth tort, the plaintiffs ask that the zone of danger rule be either abandoned or modified for purposes of wrongful birth tort. And that request was made in Semenyak and the court expressly rejected it, saying that the court had adopted Ricky and there was no reason to abandon Ricky in the context of a wrongful birth case. With respect to the statute of limitations, the issue, again, is not when certainly the parents got an indication from Baylor on whether the test had come back showing that there was a genetic cause of the Angelman's. But again, absolute certainty or being given a test result is not when it's triggered. When the statute is triggered is when there's enough information there to put the plaintiff on notice that further inquiry ought to be taken. We haven't addressed this, but the appellate court specifically declined to rule, right, on the statute of limitations. And I believe the reason that they said it wasn't properly before it because defendants relied on evidence outside of the complaint in support of it. Right. And we've been talking today more about the substance of the claim. What about the procedural situation? That's incorrect. The general rule is that a reviewing court can affirm a lower court's judgment on any basis properly presented by the record. And the appeal was of the dismissal of the complaint under Section 2615. And for purposes of that particular issue, the reviewing court is limited to the pleadings. But Children's argued in the alternative that the judgment can be affirmed based on the statute of limitations, which is a summary judgment issue, and you can go outside the pleadings in order to resolve the summary judgment issue. And the reviewing appellate court could have done that and for some reason got caught up on the fact that the trial court had decided to then consider evidence outside the record to consider the, to determine the Section 1005 summary judgment issue. And that's incorrect. And we cited the Morris case for that and the Village of Weneca case. On the merits, though, this case presents a very similar situation to that presented in Witherall, which is a 1981 case out of this case, a woman who had been taking birth control pills experienced leg pain and her doctor kept telling her, it's muscular, it's muscular, don't worry, it's muscular. And what the court held is that the trigger for the statute of limitations occurred when the plaintiff heard from other women that birth control pills can cause blood clots. And as it turned out, that's exactly what was happening. The plaintiff found out from a medical doctor that the problem was blood clots. That's when the statute of limitations is triggered. The court held that when the plaintiff heard from others, other women, that birth control pills could lead to blood clots and she was continuing to suffer this pain and was suspecting that it wasn't muscular, at that point there was enough information in the air that she was put on notice that, well, you know what, you better start investigating this. And she brought... That's a little different, isn't it, than this case? I mean, in this case, when the plaintiff decided to have Tim, she knew Angelman could be part of that scenario, but was told there wasn't a genetic problem, it was random. So the mere fact that she feels that the child has Angelman doesn't necessarily... In this case, there was even, you know, a statement made to the plaintiff that it isn't genetic. So why would she have any reason at that point to think that it was anything other than random, which she was aware it could be? She was aware that Angelman's has a genetic cause. She went and got genetic counseling, and in fact, she was put on notice. A month after going to that pediatrician appointment in August of 02, Ms. Clark started investigating and went to this other doctor and called Baylor. It's exactly the kind of situation that Witherall anticipated. She was put on notice. She did think enough of the situation, hmm, you know what, I'm starting to have some doubts about these diagnoses that I got in the past. She was on notice, and she took action on that notice, which confirms that she was on notice. And found out in September of 04, yes, now I'm certain that my suspicions were correct. But again, certainty isn't the trigger point. The trigger point is when you start having enough suspicions that you're put on notice that you have a duty of further inquiry. And the situation you described here, where the doctor was telling her one thing and she was suspecting another thing, that's exactly what the doctor kept telling the plaintiff. It's not blood clots. It's muscular. You don't have blood clots. Don't worry about it. It's not blood clots. But the plaintiff knew from other sources that birth control pills could lead to blood clots, and the court held that that was sufficient, and we have exactly the same situation here. In terms of whether parents are direct victims for purposes of the first issue, medical and other expenses, that issue we submit has been forfeited. It was raised for the first time in this court. In any event, it fails on the merits. Corgan held in the context of an emotional distress issue that parents are not direct victims. So if they're not direct victims for purposes of negligent infliction of emotional distress damages, nor are parents direct victims for purposes of medical and other expenses, and in any event, it doesn't matter. Because let's assume that Semenyak considered parents to be direct victims. Semenyak still recognized when it cited to those other cases that Justice Thomas, you and I discussed earlier, that the wrongful birth plaintiff's ability to recover post-majority damages turns on whether the common law imposes a post-majority legal obligation. In Illinois, the answer is no. With respect to the fact that Timothy does not have his own cause of action because of the foreclosure of the wrongful life tort, again, as I mentioned, there's no doubt that this is a very sympathetic situation that we have here. But the court is faced with sympathetic situations for which the law does not provide a particular remedy. Smith v. Eli Lilly, the court held that the desire to provide a tort remedy is not a sufficient reason to alter tort law significantly. And Semenyak, the court held that courts should not disregard established principles of tort law, sub silentio or out loud, in an attempt to reach the right result. And that's exactly what we have here. We have these established principles. Parents can't recover from a third-party tort feser for medical expenses of an adult child unless there is a legal obligation to cover those expenses. And Illinois law provides, both common law and statutory, that there is no such obligation. So however compelling these particular factual circumstances are, in order to rule that there is an ability for wrongful birth plaintiff to recover post-majority expenses, the court is going to have to render the law and create an exception and abandon settled principles for purposes of this case. And we submit that that ought not to be done. The legislature, and a question was asked, shouldn't we leave it to the legislature? And the answer is yes. Semenyak said so, that this, to the extent further damages or a wrongful life cause of action is sought, given this situation, which again, very difficult moral, legal, ethical, philosophical issues, this is precisely the situation where legislative guidance ought to be sought before the tort is taken further than it has been in other states. Because in other states, the availability of post-majority damages turns upon whether there is a post-majority legal obligation. See, my time's up. We would ask that the appellate court's judgment be reversed. Thank you.